Next matter, number 181614, Brendan Kelly v. Liberty Insurance Corporation. Good morning, Mr. Stein.  I do represent Brendan Kelly, the appellant in this action. With the court's permission, I'd like to reserve one minute of my time for rebuttal. May it please the court, in assessing Liberty's ability to meet its burden of proving the non-existence of insurance coverage under New Hampshire law, and having in mind the requirements of the New Hampshire under an uninsured motorist coverage under RSA 264-15, which applies to every automobile policy and every umbrella policy written in the state of New Hampshire, I ask the court to view the 77-page contract in the context of what that contract would mean to, quote, an ordinary person, close quote, in the position of the insured, in light of what is more than a casual reading of the policy, and to determine what such review would reveal to that person of ordinary intelligence. Well, do you believe that the policy as written, which would be reviewed by the extra-insured, as you mentioned, gives any inkling that there would be this kind of coverage? It gives total confused inkling. The 77 pages contains no definition of uninsured motorist coverage, as the other side suggests, relatively. That's not your argument. Your argument is that there is a lack of evidence available to show that, in fact, the name insured had refused. Not only is there the lack of evidence to show that the insured refused, there's no evidence showing all manner of things to alert the individual. There's no mention of RSA 264-15, no mention or rejection of the New Hampshire insurance coverage, no rejection form, no statement in the declaration, no endorsement showing the New Hampshire statutory UM coverage was rejected, no definition of first versus third party coverage, which the other side makes a great deal of. In short, there's nothing to alert the reasonable insured. Moreover, within the 77 pages, there are a host of exclusions, 10 pages of exclusions, starting at page, excuse me, 10 pages of exclusions, the exclusions going from A to Z. Well, come on, come on. Yes, sir. You can't make anything of the 77 pages or the 10 pages of exclusion. The substantive law is an insurance company's got to put in an exclusion of certain things unless it intends to cover them. And there's a long list of things that can be excluded or not, so they are compelled to write them all in. And the general law in New Hampshire, as I understand it, is that if any one of those exclusions, fairly red, is plain and unambiguous, then it applies. And here we have a coverage exception that comes right out and says, this insurance does not apply to uninsured or underinsured motorist law. So whether that's said in 10 pages or 77 pages, it says what it says. You've got another New Hampshire law that then says that clause won't be effective unless the name insured in writing declined uninsured motorist coverage. But that law doesn't say the written declination has to then be appended to the policy. And isn't that what you need us to hold, that there was an obligation to append it to the policy? No, and with respect, I failed to persuade the district court along the same lines. Our position has never been that there has to be the exclusion form appended to the policy. How Liberty decides to write its clear and unequivocal language, which it's obligated to do, is up to them. But somewhere it should be alerted to the reasonable insured that he is not covered. Moreover, the section... Why didn't the language I just read tell you that? Because section F1 ping-pongs back to the language provided that. And when you go to the end of that section, you must read it in the context of the underlying ACE policy. So the reasonable insured would get to section F of the 26 exclusions and say, oh, maybe this is the one. I might add, by the way, these exclusions are not particularly easy to find. But we'll put that aside. There's no table of contents in this particular policy. But assuming he gets to F and assuming he reads it the way my opponents suggest, he still is left with a proposition that first- or third-party coverage is not defined, that the exclusion statute specifically says, provided that, and then it consents, it goes and ping-pongs back to the underlying ACE policy. So it's not clear. And, indeed, the ACE policy has uninsured motorist coverage. If Liberty wanted to cure this problem, they could do so easily by putting an exclusion, an admission, a statement somewhere clearly that this company has rejected U.M. coverage under New Hampshire law. And since this policy is reviewed every year, it wouldn't be very difficult to do. Indeed, if the insured is going through the policy... So you're suggesting, in effect, that the company issue two separate policy forms, one for people who have rejected U.M. coverage and one for people who haven't. Now, people who haven't... Something which New Hampshire law hasn't required them to do. If there is no written rejection, then the statute is grafted onto every policy. Right. But there is a written rejection here. It's hidden in the bowels of the Liberty's underwriting file. But you just said it doesn't have to be attached to the policy. Right. I hope I don't fail a third time, a second time. The rejection form is a way to alert the insured that the uninsured motorist coverage under New Hampshire law has been rejected. It's not the only way you can do it. If I were suggesting to Liberty how to write their policies, I could think of three or four other ways. Okay. Let's then go back to your premise. So you're not saying that they had to attach it, but you are saying that they had some obligation, whether by attaching it or putting in some additional language, to notify every insured, not just the named insured, that the named insured had declined U.M. coverage. Correct. What New Hampshire law tells us that there is that obligation, when you have a policy that on its face says it doesn't apply U.M. coverage, that there is an obligation to do anything at all to tell anyone other than the named insured that the named insured has, in writing, declined U.M. coverage? Well, with respect to the premise, the major premise of your question, that the policy tells the insured it's been rejected, we suggest, as I say, that that particular section, F, is ambiguous. But the answer, again, still boils down to the company that controls the language of the policy and has an obligation to follow New Hampshire law, which means, according to the legislative history of 264.15, insurance should know that this particular company, which was obligated to have an insured motive coverage, has decided against it, in some clear fashion. The easiest thing, of course, is a rejection from the tax. But the New Hampshire statute doesn't put that obligation on the insurer with respect to omnibus insureds. People other than the named insured has to be offered the coverage and can decline it. But there's no other or further obligation imposed by New Hampshire law with respect to omnibus insureds. The fascinating thing about the legislative history attached to... Not the legislative history. The legislature speaks to us through the statute. We look to the legislative history, among other things, if the statute is ambiguous. But the statute here is clear, as far as I can tell. There's no ambiguity. We agree. The statute is clear. In writing. And the implication of in writing doesn't mean in the janitor's file. It means in writing to the insured or the insureds who are using these vehicles. It's a minor thing to do. And I only suggest the legislative history with respect, Judge, because that's the basis on which the in writing section... I don't even understand what you mean when you say in writing doesn't mean in the janitor's files. I have no idea what you're saying. If they offered the named insured the right to have U.M. coverage and the U.M. coverage, the named insured sent back a writing declining it, then it seems to me the statute is fully complied with even if the insurer put it in the janitor's files. It's got nothing to do with where the insurer puts it. Then the import of what the legislature was trying to do, let the insurers know, and that's the basic New Hampshire law relative to insurance contracts. Then the insured is not put on notice that this policy, which if he knows the law, knows should have a U.M. provision, doesn't.  Thank you, sir. Good morning. May it please the court, Nancy Adams on behalf of the Appalachian Liberty Insurance Corporation and with me is Lavinia Wiesel and a representative from Liberty is also here, Lawrence McNally. The issue on appeal here is very narrow. The meaning of the phrase in writing statute under the New Hampshire underinsured motor statute. Mr. Kelly has not appealed whether the umbrella affords coverage for U.M. claims. It does not. Instead, what Mr. Kelly is appealing is whether the U.M. statute requires an insurer to affirmatively state in a commercial umbrella policy that the named insured rejected U.M. coverage by either attaching the rejection form or making some other affirmative statement or type of notice to other omnibus or other insurers. But you filed a surreply brief which attributes another argument to him, which is that the policy language itself confers coverage. The surreply brief addresses two issues that were not raised in Mr. Kelly's opening brief. In fact, when you read Mr. Kelly's opening brief... No, I'm talking about his opening brief. You just told us that the plaintiff is making only one argument, and that's a statutory construction argument. But you were granted permission to file a surreply brief on the representation that he was making a different argument. He did file that. He also makes the argument that under the auto coverages exclusion F1, he says that that exclusion, in effect, confers U.M. coverage. However, if you look at what the auto coverages exclusion is intended to do, is it is barring coverage for automobile liability claims unless it is provided for in the underlying insurance. The Second Circuit has discussed this in depth with respect to that particular issue and has found that even where there's no U.M. exclusion and F2 actually contains a U.M. exclusion, that where there isn't one, that that carve-out for auto liability coverage does not confer first-party U.M. coverage because, again, it's liability coverage. We're talking about damages an insured is legally obligated to pay as opposed to injuries the insured himself is suffering. Secondly, the court said in the Second Circuit, is that you cannot, through an exclusion, in fact, expand the insuring... I understand you don't think much of the argument. I was simply trying to get you to acknowledge that the argument is in the case... The argument is in the case. ...because your opening remarks indicated to the contrary that this was purely a statutory construction argument. In the reply brief, Mr. Stein addresses the F2, which is why he filed a short reply brief, because it had not been briefed before the court. With respect to the statute itself and the in-writing requirement, there's at least five reasons why the court should decline Mr. Stein's invitation to broaden the statute. First, the statute merely provides that the rejection has to be made in writing, which was done. There's no dispute that Plum Creek actually rejected U.M. coverage. That is in the Appendix of 332. Secondly, the plain terms of the policy do not require the named insured to provide every current or potential insured with notice of the fact that the named insured, Plum Creek, has rejected coverage. The statute expressly provides that Plum Creek has a right to make that decision on behalf of all insureds. In addition, it's prospective, because it applies not only to the current vehicles that are insured under the umbrella policy, but it also applies to any future vehicles that may become eligible for coverage under the umbrella policy. Third, again focusing on the prospective nature, the statute does not require, as certain states do, that the rejection occur on a yearly basis. Instead, once the rejection has happened, then it goes forward effectively on an evergreen basis, unless, again, the insured requests in writing that the coverage be reinstated. And the reason for that is simply to make it as opposed to an oral situation where you have an insured saying, I'm rejecting U.M. coverage, it's oral. Instead, the statute requires that it be in writing, so there's some sort of paper trail in the event of a claim. Fourth, to the extent some sort of notice is required, which again, Liberty Contends would extend or expand the statutory requirement, the policy itself is consistent with the rejection. First, in terms of the insuring agreement, which provides, as I stated, that it provides coverage for damages the insured is legally obligated to pay. That's a classic liability policy, a third-party policy, and does not afford first-party coverage. And second, there's the U.M. exclusion, which is under auto coverage's F2, which I think you quoted, if there's no coverage for U.M. claims, unless there's an endorsement on the policy that's attached, and there is no such endorsement. With respect to the others, and this issue has come up across the country in other cases, and the courts have consistently held, in Mitchell v. Liberty, for example, which is a Kansas Supreme Court case from 2001, that to the extent the regulators had required, contrary to what the statute said, that the regulators said you had to attach or provide some sort of notice, that was not a valid requirement under the statute. In Conant v. Michigan Insurance, that's an Arizona Supreme Court case. Again, the court held, upon rejection, that's effective. There's, again, no need to attach the rejection form or provide any other sort of notice with respect to the declination of U.M. coverage. And that's contrary to Romero v. Daringland in New Mexico, where the statute specifically says you have to attach or somehow affix the rejection to the insurance policy. Here, there is no such requirement, nor does New Hampshire case law suggest otherwise. Given this, the liberty respectfully requests that this court decline Mr. Stein's invitation to expand the New Hampshire statute beyond what is written, unless the court has any other questions. Thank you. Thank you, counsel. May it please the court, there is, of course, a distinction between statutory rights and contractual rights. This is a statutory right case. It obligates liberty to act in a certain way. That's the long and short of it. When you get beyond that, even in the reply brief and the SIR reply brief, I still suggest the language on which liberty replies simply will not carry the day because it ping-pongs back to the underlying U.M. coverage of the ACE policy. That's all I have to say. Thank you again. Thank you, Mr. Stein.